Case Numbers 13-3558 and 13-3585 Nicole Cultrona v. Nationwide Life Insurance Company, et al. Good morning. My name is Kelly Lawrence. I represent Nicole Cultrona in this matter. This case is about the denial of an accidental death benefit. It arose when Sean Cultrona, the decedent in this case, died in his bathroom following a fall in which he fell into the shower door and asphyxiated himself on the shower. That occurred on June 5, 2011. The coroner performed an autopsy on June 6, 2011 and ruled that the death was an accident and that it resulted from asphyxia by extreme restricted position and prolonged an extreme hypertension of the neck and torso while intoxicated. Mrs. Cultrona, the spouse of Mr. Cultrona, applied for benefits under the accidental death policy and was denied those benefits and that decision was upheld in the district court. The Benefits Administration Committee, which is the acting entity appointed by Nationwide, abused its discretion in making this determination. And this was all done on the administrative record. Is that correct, counsel? That's correct. While the abuse of discretion, we recognize that standard is very high, it still needs to be the result of deliberate and principled reasoning and it needs to be supported by substantial evidence. In this case, there was an inherent conflict of interest between Nationwide and the Benefits Administration Committee. That committee is appointed by Nationwide. It's made up of director level or higher members of Nationwide. So that is always the case? In this situation? Yes. Right. So that's the usual way of managing these claims? Well... It would always be this, if it's inherent conflict of interest, this would always be the case with all the claims? No. The conflict of interest arises when the payer and the administrator of the plan are one and the same. And that's particularly true in this case when the Benefits Administration Committee is essentially director level or higher members of Nationwide. They are indemnified by Nationwide for any of the decisions that they make. This would not be unique in Nationwide's policy challenges? I believe that it would be. Maybe not necessarily unique, but the Sixth Circuit does recognize that there is a conflict of interest under these circumstances, which would seem to suggest that there are other circumstances when the benefit plan isn't... Okay, I meant with Nationwide. That's what I was trying to establish, that this is not unique. It's not unique, but in order to circumvent the conflict of interest or lessen it, there are things that Nationwide could have done. They could have walled off people who had a financial interest. You used the could have done, which is distinguishable from must do. Right. Because the question is whether or not a conflict of interest should apply here. That doesn't mean that it's automatically arbitrary and capricious, does it? No, it does not. It means that it is a factor in making the determination. Okay, but you don't have anything in the record showing specifically that there was some conflict of interest beyond the fact that they're related parties. Well, the court in Cibere versus L3 Communications put together four factors to look at if there's a conflict of interest and what that means. Number one is whether there's inconsistent reasons for the denial, which in this case, Mrs. Coltrona's benefit was initially denied under an exclusion that had to do with driving while intoxicated. When she hired counsel to oppose that decision because Mr. Coltrona died in his bathroom, not while operating... Wait now, it was based on exclusion 12, right? Right. The exclusion 12 doesn't mention automobile. Well, it did, and that's... No, the reasoning of why exclusion 12 applied was originally erroneously applied to the motor vehicle. And they said, oh, wait, wait, that was the old version. Now we've got a new version of exclusion 12 that was applicable here that doesn't mention automobile, right? The denial letter actually cites the wrong exclusion, the initial denial letter. And it also says that the decedent's blood alcohol content was in excess of the level at which Ohio presumes intoxication. Ohio presumes intoxication in very limited circumstances, driving a boat, driving a motor vehicle, or in a worker's compensation case. But isn't there another provision of the Ohio Code that talks about that the reason given by the coroner is presumptively the reason? As to cause, manner, and mode of death. And what's important about that is two things. Number one, that statute was not looked at or reviewed by the Benefits Administration Committee. Their own bylaws state that you have to identify everything that you looked at. What the Benefits Administration Committee did is they called a conference call with two members of the committee on the phone. They looked at the file that Starline, which is their third-party administrator, had put together. They looked at the plan document, and they looked at the insurance policy. The plan document and the insurance policy that had not at this time been provided to Mrs. Coltrona. From that conference call, they wrote a letter that day denying the claim. They didn't look at Revised Code 31319. It's nowhere in the record. And, in fact, it didn't come up until this case was already filed in the district court. The whole inquiry that you're going into here, it seems to me, this idea of an inconsistent reason for their actions, goes to the question of whether they're being disingenuous in what they did here. In other words, they're lying about their reason for the denial because they had this conflict of interest. That's really where you ultimately have to end up. And it seems to me here they've always said, we're not going to pay because the guy was drunk. Now, they made a mistake in connection with why that would allow them to deny one version of the exclusion versus another. But they've never varied from the idea that his alcohol content is why they denied this claim, have they? That's correct. But the previous Exclusion 12 on which they initially denied the claim indicated that he would be driving a motor vehicle. I understand that. They made a mistake. But where's the dissembling here? Where did they say something that shows a shifting rationale that would allow us to conclude that they're lying about it, as opposed to just having made an error? Basically, your argument is they screwed up. They made an error. So, therefore, that corroborates your claim they had a financial interest in this matter. Therefore, they get less deferential review. I mean, it's a whole series of what-ifs. Well, the conflict of interest piece is part of it. But what we believe is that the record shows an intent to deny from the start. Number one, they made a decision based on the wrong exclusion, and the decision was based on his blood alcohol level being in excess at which Ohio presumes intoxication. But it's always been based on the blood alcohol, has it not? Correct. And we believe that the language of the policy, which says that the individual has to be deemed and presumed under the law of the locale in which the injury occurs to be intoxicated, to be controlling here. And there was no attempt to look at what the law was. The fact is they were right, though. I mean, even though they didn't peruse Ohio law in making that decision, they basically looked at the blood alcohol, as I get it, and said, well, that's why he died, and we don't cover that. Well, the coroner said. They were actually correct about Ohio blood alcohol, not with respect to vehicles, but what the coroner said. Well, the coroner's report indicates that he died by asphyxia. But the coroner didn't eliminate the blood alcohol causation in that. The coroner didn't indicate that the blood alcohol causation, that there was a causal connection between the blood alcohol. I thought it said acute ethanol intoxication is right in the coroner's report. It did, as a contributing cause. And it was .22, wasn't it? That's correct. But this court in Lone looked at a similar issue, and in that case the decedent fell down the stairs while intoxicated. He was .18 blood alcohol level when they did the test. And the court said, we can't look at the driving statute because it's not illegal to be above the driving limit when an individual is in their home. Was there any coroner's autopsy in that case? There was an autopsy, and there was also a medical examiner that was retained by the insurance company to review the case. In this case, there was no medical examiner that reviewed the file. There was no interaction with the coroner. There was a coroner's report that the decision was based on. And under the applicable law, there wasn't anything that deemed and presumed Mr. Coltrane to be intoxicated as a matter of law, which is what they're calling it. Not as a matter of law, but is there any proof in the record to the contrary? Do you have an expert who says, oh no, he wasn't intoxicated, sober as a judge? We don't have any expert to say one way or the other, no. I guess when we kind of cut to the chase, what I'm trying to figure out is the coroner says that while intoxicated, that's based upon this blood alcohol level, whether it's however, we can ignore however it applies to driving, one way or the other. So how can they be arbitrary and capricious of having denied this claim based upon, one, the exclusion, and two, the coroner's report? While intoxicated is different than an injury being caused by intoxication, and the case law that's cited in our briefs makes that distinction, including the case in this court, the loan decision. The individual fell down the steps and had a skull fracture. He was intoxicated at the time. Mr. Coltrona lost consciousness in his bathroom and fell and was asphyxiated. But the standard doesn't address really whether they were wrong. The standard addresses whether they were reasonable in the way in which they made this determination. They looked at the file, they looked at the coroner's report, they looked at the blood alcohol level. So why is that arbitrary and capricious? Because their own plan language says that they need to be deemed and presumed in the law of the locale to be intoxicated. It doesn't say you have to be intoxicated and then go on to explain what intoxication means. They could have done that, but they left it ambiguous. And if we're going to be deemed and presumed under the law of the locale, then we have to look at the law to determine, just like the loan case, what is illegal? What is the legal definition of intoxication? And does that fit into this exclusion? What do you say is the legal definition of intoxication? In Ohio, in the law of the locale in which this injury occurred, there are two laws that relate to intoxication. One is public intoxication, and the other is selling to minors. Now, just like the loan case, what the loan case said is, we can't apply the driving while intoxicated because this gentleman was in his home. So we're going to apply a definition that the Kentucky Supreme Court found to be intoxication, and that was a definition that related to public intoxication. That also didn't apply to Mr. Loan's situation. So the court found that the exclusion didn't apply and that the insurance company abused its discretion in determining that it did. Remember, there's no question here about whether or not this was an accident. The question is whether or not this exclusion applies to the circumstances of this case. But if we go back to the exclusion, the exclusion uses the language to be under the influence of alcohol or intoxicating liquors. Be deemed and presumed under the law of the locale in which the injury occurs. That presupposes that there's some sort of legal finding of intoxication. It doesn't say that the individual was intoxicated or that the individual was under the influence. It could have said that. They claim to have made a change relatively recently. Is there a dispute here? I guess I'm back to where Judge Gilman asked you before. Is there really any factual dispute about whether he was under the influence of alcohol and intoxicating liquors? That's not the dispute here. The dispute here is whether or not— I get to frame the question. And you asked me if there's any dispute. Yes, I'm asking you is there any dispute about whether he was under the influence of alcohol or intoxicating liquors? I'm not adding any more phrases, any more words. I just want to know the answer to that question. The answer is no. The dispute is whether or not— There is no dispute about that? Whether he was—I'm sorry. I'm not— You want to—in your mind, you want to reframe my question. So just listen to the question, and then you can say, but I'm wrong to ask the question. That's fine. Is there a dispute about whether he was actually under the influence of alcohol or intoxicating liquors? There's not a dispute that he had been drinking that night. You're reframing it. I just want to know in the language of the policy, is there a factual dispute about whether he was under the influence of alcohol or intoxicating liquors? It's difficult to answer your question because the policy language is broader than that. The question— It's not difficult. The question asks whether it was caused. It's not difficult. It's yes, no, I don't know. Those are your choices. I don't know. Okay. Fair. Thank you. The other issue in this case is that Starline in its own bylaws and also in the implementing regulations of ERISA require that a medical examiner be present during a review of a claim involving a medical decision. No medical examiner was present. No medical examiner was contacted. There was not even an independent file review. And if you look at the circumstances of this case, it shows an intent to deny from the start. There's an initial denial that has the wrong decision on it or the wrong exclusion posted and then support for that exclusion as to why it was denied. There's no medical authority whatsoever consulted as part of its review. What they did is just decided to summarily deny this because there was intoxication involved. And that's not what the plan language says. I think we have your argument, Ms. Lawrence. Thank you. We have a rebuttal. You may proceed. Thank you. I'm sorry. Start. Hey, please, the Court. I'm Daniel Sirsik, and I'm here today on behalf of the Appellee's Nationwide Life Insurance Company and Starline Group along with the Appellee Cross-Appellant, the Benefits Administrative Committee. This is a case governed by ERISA. There are two distinct ERISA issues that are presented. The first is the question of whether the Benefits Administrative Committee's decision denying these accidental death benefits should be affirmed. And the second question is whether the district court's decision to impose a statutory penalty on the Benefits Administrative Committee for allegedly failing to provide requested documents was an error. Why don't you, if you would, please start with answering the question Ms. Lawrence raises with respect to the policy requiring a medical examiner to be present. Yes. Well, the policy itself does not require a medical examiner to be present. You heard her argument. Would you address that? Yes, absolutely. So the basis of her argument is twofold. She suggests that there is a- No, I mean with respect to the medical examiner. Is she wrong to say that that was required? Yes, she's absolutely wrong to say that a- Explain why you say that. Because there was no medical dispute in this case. There were no medical issues in doubt when this issue came before the Benefits Administrative Committee. Why do you say that? We just spent 15 minutes talking about why the blood alcohol may not have risen to the legally presumed limit in the state of Ohio. The only medical evidence in this case is the medical evidence that came from the medical examiner and the coroner's report in this case. And that is, for all intents and purposes, an independent medical opinion that could not- So the triggering of the requirement that we were pointed to only occurs where there is a debate? Yes, Your Honor. I believe that's right. It's there, isn't it? It must be there. I know Ms. Lawrence wouldn't tell us it is if it weren't. Ms. Lawrence is pointing to a provision in the bylaws for the Benefits Administrative Committee. It is not a part of the plan itself or a requirement of the policy, nor is it a requirement of ERISA's statute or regulatory requirements for a full and fair review. Just finish with explaining why it wasn't triggered here, even though it was in the rules of the committee. It wasn't triggered here, first and foremost, because there was no dispute with respect to the medical evidence. The medical evidence was in before the Benefits Administrative Committee. But you say there's a dispute. It has to be among the committee? No, a dispute, for example, brought to the committee by Ms. Coltrona on appeal. So if Ms. Coltrona's attorneys, who represented her in connection with her appeal, had taken the position that the medical examiner and coroner's report was wrong, then there may have been competing medical opinions that assistance of an additional medical opinion may have helped. All right, you can move on to your argument. Okay, so it's still my view that under those circumstances, the Benefits Administrative Committee would have been permitted to rely on the opinion of the medical examiner, the coroner's report. That's specifically one of the purposes of Ohio statutes addressing these coroner's reports. Ohio Revised Code 313.19 provides that it's permissible that the opinion of the coroner, the opinion of the medical examiner, is presumptively the cause of death, the manner or mode of death. And it's also true that I cited in my brief Ohio Revised Code Section 313.10E3C. And, in fact, I want to clarify that I cited it wrong. I put an extra digit in there. So for the Court's benefit, it is Section 313.10. And that provision specifically provides that for insurance companies, they're permitted to rely upon these coroner's reports in making benefits determinations. It's one of the purposes of the coroner's report. And when you look at the standard that is set forth in the policy and in the exclusions, when you're looking for a legal presumption of whether somebody was intoxicated, what you're looking for is a legal finding of what happened, the cause of death. And that is exactly what the coroner's report provides in this case. It's very interesting. I mean, the husband didn't die of alcohol poisoning. He died of asphyxiation. So it sort of depends on, well, but what was the cause of that? But, I mean, does it have to be the immediate cause or is it okay if it's a contributory cause? It can be a contributory cause based on the language of the policy. The exclusion provides that no benefit will be paid for any loss resulting in whole or in part from or contributed to, by, or as a natural probable consequence of this list of exclusions. And so it can be a contributing cause and still trigger this exclusion. But I think it's important to recognize that the facts that are laid out in the medical examiner's report are pretty compelling. The medical examiner stated in its report that Mr. Coltrone had died to an apparent positional asphyxia when he became unconscious while intoxicated, passed out. And so the fact that positional asphyxia is the immediate cause of death is very clear from the medical examiner's report that the positional asphyxia was because Mr. Coltrone had passed out in his bathroom, leading to his chin being on the edge of the tub and his passing away. And he presumably passed out because of his alcohol intoxication? That's what the medical examiner found. Is there any contrary proof in the record? There is no contrary proof in the record, none whatsoever. And it's simply not a disputed issue whether he was intoxicated at the time. What about the fact that, I mean, even though it's .22, and that exceeds the Ohio driver's presumption of intoxication, what is the Ohio law on when are you considered intoxicated if you're not driving a vehicle? Well, for the purposes of this case, what we're looking for, if we look to the language of the exclusion and we're asking if Mr. Coltrone was deemed and presumed under the law of Ohio to have been under the influence of alcohol when he passed away, that's precisely what the coroner's report provides for us because it provides a legal presumption that the cause of death found by the coroner, found by the medical examiner, is valid. And so it dovetails perfectly with this exclusion because it provides the legal presumption that Ms. Lawrence suggests wasn't found here. Now, the Benefits Committee didn't actually cite that provision of the Ohio Code, did it, though, in denying the claim? No, and frankly, they weren't required to. What the Benefits Administrative Committee did in its denial letter is find, and I'm going to quote from the letter here, since the coroner's findings show that Sean Coltrone's death was caused by acute ethanol intoxication, the committee determined that the loss is excluded by policy exclusion number 12. There's no question that the Benefits Administrative Committee, in making its decision, relied directly upon the coroner's findings. And so I suppose what I'm saying is there's no requirement in ERISA regulations or otherwise that would require at each step of the Benefits Administrative Committee's thought process to say that not only are we basing this directly on the coroner's findings, but we're going to drop a footnote and say that under Ohio law, the coroner's report creates a legal presumption of validity with respect to the stated cause of death and the mode and manner of death. I think what Ms. Lawrence is arguing is I was trying to get her to agree that this person was under the influence of alcohol or intoxicating liquors, and she pushed back on that correctly by saying that that determination under the policy, as she reads it, is not made based on the .22. It's made on the prior language about being deemed and presumed under the law of the locale in which the injury is sustained. So we know there's a law that says you can't drive drunk. I'm gathering there's a law that says you can't drive a boat drunk. But is there a law that says you can't walk around in your bathroom drunk or a law that says if you have a certain blood alcohol content when you walk around in your bathroom, we're going to presume that you're drunk? Because obviously there are different reasons why we would presume somebody's drunk when they're driving a car so we don't have to fool around with trying to figure out whether they really are. But why do we care if you're walking around in your bathroom drunk? Well, I think that the only proper response to your question is that there's nothing in this exclusion that requires an element of criminality or misconduct or prohibited conduct under Ohio law. What the exclusion refers to is being under the influence of alcohol or intoxicating liquors. And so there is no requirement, for example, that... But is there a law, state or local, that presumes somebody is drunk based upon any level of a blood alcohol test if they're not behind the wheel of a car or a boat? I believe that the application of the .08 standard to Ohio's workers' compensation law and to the... He wasn't at work. Absolutely right. He wasn't. And the .08 also applies in the context of public contractors and the standard that they're required to apply in testing their employees. And I think that obviously where you're going is the question of does Ohio have a specific standard that would apply in the insurance context? And the answer is no. The .08 standard is not articulated that way in Ohio statutes. But if you look at... I thought we'd sort of get around to this sooner with both Ms. Lawrence and you. Doesn't it come down to the question of there isn't any law of general applicability in Ohio about how much alcohol you can have when you're on private property and whether you are or are not drunk? So it comes down then to whether the insurance company was reasonable in imputing these other standards that apply in other instances in interpreting the language of their own policy. The answer to that is no, because if you look at the BAC's decision, the BAC does not rely upon the .08 standard for intoxication. The BAC very clearly states that since the coroner's findings show that Sean Coltrane's death was caused by acute ethanol intoxication, the committee determined the loss was excluded by policy exclusion number 12. And so the BAC, the decision that this Court is reviewing, does not rely upon a .08 blood alcohol level standard. We do make the argument in the briefs that it could have done so if it wanted to, and we cited the court decision out of Florida that interpreted the exact same policy language that's involved here. Was it safe to say then that the BAC just ignored the phrase being deemed and presumed under the law of the locale in which the injury was sustained? Absolutely not, because the coroner's report under Ohio law provides that presumption that there has been a legal finding that the person is intoxicated. I get you. You're saying you didn't use the presumptions in the driving or the worker's comp statute. You used the presumption in the coroner's statute. Absolutely right. Got it? Absolutely right. The coroner may, in fact, have relied on this .08 as applicable in Ohio to different contexts, right? Well, we don't know that for certain, but if we look at the police reports and the other information that was available to the coroner, the witness statements were that Mr. Coltrane was out drinking heavily, that he was stumbling, walking into chairs, falling down before he drove home that night and passed away. And so there is overwhelming evidence as to his intoxication that really isn't in dispute in this case. Was there any mention about binge drinking? Yes. Was that in the coroner's report? In the coroner's report, the coroner found that liver toxicology indicated a session of alcohol binge drinking the night before. So you would say that you're not acting in an arbitrary and capricious way if you rely upon the coroner's report in the absence of any other medical evidence that suggests this guy was not intoxicated. Absolutely right. Does that encapsulate where we are? Absolutely it does. The coroner's report is sufficient basis for the denial of benefits under this. You have very little time to address why there was an abuse of discretion in sanctioning your company for failing to provide the policy. There is a very limited scope of documents that a plan participant may request to trigger the statutory penalties provision under ERISA. Policy is not one of them? The request in this case did not include a request for the policy. If the policy had been requested explicitly, it absolutely It requested all documents that you relied upon. You surely relied upon the policy, right? That's not the way the request was phrased. The request that was sent to Starline at this point, it wasn't sent directly to the administrator of the BAC, requested that the All documents comprising the administrative record and or supporting Nationwide's decision. Absolutely right. And the policy was not a document comprising the record or supporting the decision? The request for all documents comprising the record and supporting the decision is very clearly a request for documents that's covered by a different section of the ERISA statute and the ERISA regulations. In order to trigger the penalty provisions of ERISA for failure to provide documents, the Courts of Appeals of the 2nd, 3rd, 5th, 7th, and 10th Circuits have all held that a plaintiff must have provided clear notice of the documents they sought to obtain in order to trigger the statutory penalty provision. This circuit has not had an opportunity to If the argument you wish to present is in your brief, we'll have it. Your Honor, if I may say one last thing. The district court said that in making the decision, the court was relying upon both the text of the request and the appellant's representation of that request in her briefing in order to find that the request was seeking a copy of the policy document. And that in and of itself Would you like us to look at that point? Absolutely, Your Honor. Thank you very much for your time. I hope to make two quick points, but I wanted to address the statutory penalty issue first. ERISA Section 504 requires that the plan provide the latest updated instruments under which the plan is established or operated. In this case, Mrs. Coltrana had already been given the wrong plan documents twice and cited a plan exclusion that did not apply to the situation under which her husband expired. And if you look in the record, the email exchange in November 2011 between Nationwide and the third-party administrator shows that they had noticed that Mrs. Coltrana was asking for the plan. They were concerned about whether or not to provide it to her because they weren't sure, in the Nationwide employee's words, I'm not exactly sure whether the communication of the change, meaning the change in Exclusion 12, ever went out. So ultimately they determined not to provide her with a copy of the plan following her request in November. A copy of the policy. I mean a copy of the policy or the plan. Neither of those documents were provided, although they were reviewed. And these documents were not provided until after the case was filed in federal court and a case management conference was held in which the issue was discussed. That's when the plan documents were provided to us. It wasn't because of confusion into the language. That's the section that he was alluding to that he says would inform somebody about administrative record and or supporting the decision. Do you know what he's talking about? That's the provision to provide the copy of the administrative record, which is different than providing. Provide us with a copy of a plan on which you made your decision. So if we're over in the section about administrative record, if that's what that language fairly would be interpreted by the plan administrator to mean, does that section also require you to give a copy of the plan or the policy if you've not already done so? Or is that talking about different stuff? I don't know. All right. Fair enough. But what I do know is that the nationwide and its third-party administrator clearly understood the request as a request for the plan and decided not to provide it given the fact that they were unclear, and we're still unclear today as to whether or not the Exclusion 12 was ever communicated. Two other points. Mr. Sirsak wants the court to accept that they're not required at all to consult any laws in making the determination. We weren't asking for a footnote here. We were asking for some reference or some understanding as to whether or not any laws were consulted at all. There's no mention of 313.19 because that came up following the appeal in this case when counsel got involved. They also want us to accept that they're not required to have a medical examiner in this case. What their bylaws specifically say is that the plan requires benefit plans to consult a health care professional who has appropriate tr- I'm sorry, I'm reading the wrong thing. The plan requires a medical expert to be present at a meeting for a discussion of all appeals that involve a medical issue. But don't you have to tell us how that, had that, let's assume it applies, let's assume they didn't comply with it. Don't you have to also show to us or some indication that had they done what you say they were supposed to have done, it would have led to a different conclusion? Yes, and if they- And what evidence is there that it would have led to a different conclusion? Because we asked you earlier, are there different autopsy conclusions? Do you have a medical doctor that's going to say, oh, this guy had a high alcohol tolerance, he wasn't drunk at .22? It's hard to say what a medical, if they had followed their plan, what a medical expert would have said. So you don't know. This is just pure speculation what, had they done what you say they should have done. If they had done it, it would have helped you. This is an abusive discretion standard, and I understand that it's difficult. But it can't be that plans cannot follow their own bylaws and not consult any laws when they have the ability to write their own plan to say, deemed and presumed under the law of locale in which the injury occurs, to just rubber stamp a decision. The BAC did nothing further than look at Starline's file when making a determination with two representatives on a phone call. That's a situation- I have your argument. Sorry to cut you off. Thank you. I appreciate it. Fair is fair. All right, thank you. Thank you both. We have your case, and we will consider it carefully and issue an opinion in due course.